IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENNY V.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO, Commissioner of Social Security | : | NO. 25-4612 |

**MEMORANDUM AND ORDER**

CAROLINE GOLDNER CINQUANTO, U.S.M.J. September 29, 2026

Plaintiff filed this appeal from the Commissioner's decision denying his application for disability insurance benefits ("DIB"). For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and affirm the Commissioner's decision.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on July 5, 2022. Tr. at 72, 73, 189-90. He alleged disability beginning on August 13, 2021, as a result of dorsalgia, vertigo, dizziness and giddiness, herniated lumbar discs, anxiety, depression, attention deficit hyperactivity disorder ("ADHD"), hernia, and asthma. Id. at 189, 226.[2] Plaintiff's

[1]Consistent with the practice of this court to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using his first name and last initial. See Standing Order – In re: Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]In order to be eligible for DIB, Plaintiff must establish that she became disabled prior to the expiration of her insured status or date last insured ("DLI"). 20 C.F.R. § 404.131(b). Here, the ALJ found and no one disputes that Plaintiff's DLI is March 31, 2026. Tr. at 28, 220.

application was denied initially on April 25, 2023, id. at 90-91,[3] and on reconsideration on August 23, 2023. Id. at 96-98.

On October 2, 2023, Plaintiff requested an administrative hearing. Tr. at 99-100. After holding a hearing on May 21, 2024, id. at 46-71, the ALJ issued an unfavorable decision on August 7, 2024. Id. at 26-41. The Appeals Council denied Plaintiff's request for review on June 13, 2025, id. at 3-5, making the ALJ's August 7, 2024 decision the final decision of the Commissioner. 20 C.F.R. § 404.981.

Plaintiff sought review in federal court on August 12, 2025, Doc. 1, and the matter is now fully briefed. Docs. 12-14. The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). See Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 4.

## II. LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere

[3]Ordinarily, the administrative record contains a Disability Determination Explanation in addition to the Disability Determination and Transmittal. The record does not contain the Disability Determination Explanation at the initial consideration stage.

scintilla." Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. 97, 103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1. Whether the claimant is currently engaged in substantial gainful activity;
>
> 2. If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;
>
> 3. If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4. If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and

> 5. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. § 404.1520(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of his age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III. DISCUSSION

### A. ALJ's Findings and Plaintiff's Claims

In her August 7, 2024 decision, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of August 13, 2021. Tr. at 28. At step two, the ALJ found that Plaintiff had the following severe impairments: lumbar stenosis, epilepsy, asthma, hernia, depression, anxiety, and ADHD. Id. At the third step, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." Id. at 29. The ALJ found that Plaintiff had the RFC to perform light work except he should (1) **never** climb ladders, ropes, or scaffolds, reach overhead with the left upper extremity, perform work demanding a specific production rate such as assembly line work or work requiring an hourly quota, perform tandem work where fellow employees would rely upon the completion of a specific task by Plaintiff to complete a production process; (2) **occasionally** climb ramps and stairs, stoop, and make work related decisions; (3) **frequently** balance on even terrain; and (4) **avoid** concentrated exposure to extreme

cold, wetness, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards such as unprotected heights, in a moderate noise intensity level. Id. at 32. In addition, the ALJ found that Plaintiff can understand, remember, and carry out simple, verbal, written, and demonstrated instructions, and can perform work that is self-paced and not paced by a machine, in a stable work environment, where the workplace and work process would remain the same from day to day. Id.

At the fourth step, the ALJ found that Plaintiff is not able to perform his past relevant work as a maintenance mechanic. Tr. at 39, 68-69. Based on the Plaintiff's age, education, work experience, and RFC, a vocational expert ("VE") testified that Plaintiff could perform the jobs of price marker, garment sorter, and laundry folder. Id. at 40; see also id. at 69 (VE's testimony). As a result, the ALJ concluded that Plaintiff was not disabled. Id. at 40.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to (1) properly incorporate limitations in the RFC assessment, as well as the hypothetical posed to the VE which were included in opinions the ALJ found persuasive, (2) properly evaluate Plaintiff's vertigo and syncope and include resulting limitations in the RFC assessment, and (3) include any limitations in the RFC assessment to address Plaintiff's moderate limitations in interacting with others. Doc. 12. Defendant responds that the ALJ's decision is supported by substantial evidence and properly addressed the limitations in the opinions, Plaintiff's vertigo and syncope, and mental limitations. Doc. 13. Plaintiff also filed a reply. Doc. 14.

## B. Plaintiff's Claimed Limitations and Testimony at the Hearing

Plaintiff was born on October 1, 1992. Tr. at 191. He completed the ninth grade, and has past relevant work as a maintenance mechanic/technician. Id. at 51, 67. He lives with his girlfriend and young son. Id. at 56. Plaintiff was 28 years old when he alleges he became disabled on August 13, 2021, and 31 years old at the time of the ALJ's August 7, 2024 decision. Id. at 191.

At the hearing, Plaintiff testified as follows. He has trouble reaching overhead with his left (dominant) arm and walks with a walker. Tr. at 63-64.[4] He can sit for half an hour to an hour before he has pain in his back and pain and numbness in his legs. Id. at 64. He can lift 10 pounds. Id. He suffers from short-term memory loss and has difficulty concentrating. Id. at 65.

Plaintiff had surgery to repair a hernia in the past, but believes he "might have messed it up somehow because [he has] been dealing with the same pain that [he] had when [he] had the hernia." Tr. at 59.[5] He has asthma and uses albuterol once or twice a week when he wheezes. Id. Plaintiff was diagnosed with epilepsy in 2020 or 2021 and at

[4]The walker was prescribed after he had back surgery in 2014. Tr. at 65. When questioned, Plaintiff explained that he used a cane and a back brace when he returned to work after the back surgery. Id. at 65-66. According to Plaintiff, he uses a cane outside his home and the walker when he is inside the home. Id. at 65.

[5]Plaintiff testified that his doctors imposed a lifting limit of 25 pounds. Tr. at 63. When questioned, he explained that the lifting limit was imposed after his hernia surgery, but he still does not lift anything in excess of 25 pounds because he is having the same pain. Id.

the time of the administrative hearing in October of 2023, his last seizure was in November of 2022. Id. at 60-62.

A VE also testified at the administrative hearing. Tr. at 67-70. The VE characterized Plaintiff's jobs as a maintenance mechanic as a skilled, heavy job. Id. at 67-68. Although Plaintiff identified other jobs, see id. at 263, and the VE considered Plaintiff's other jobs, see id. at 67-68, the other jobs did not constitute past relevant work.[6] The ALJ asked the VE to consider someone of Plaintiff's age, education, and background, who could perform light work, with the other limitations contained in the ALJ's RFC assessment, see supra at 4-5. Id. at 68-69. The VE testified that such an individual could not perform Plaintiff's past relevant work. Id. However, such an individual could perform the jobs of price marker, garment sorter, or laundry folder. Id. at 69. The VE also testified that the use of a walker or a cane for balance and ambulation would preclude all competitive employment at the sedentary and light levels. Id. at 70-71.

[6]On June 22, 2024, prior to the ALJ's decision in this case, the definition of past relevant work changed from 15 years to 5 years. See Marvella W. v. Comm'r of Soc. Sec., Civ. No. 23-21104, 2024 WL 4533331, at *7 n.2 (D.N.J. Oct. 21, 2024) (explaining new regulation regarding past relevant work). Thus, any jobs Plaintiff had more than 5 years prior to the ALJ's decision were irrelevant to the VE's consideration.

### C. Medical Records

1 Treatment Providers

a. Back Pain

Plaintiff has a history of lower back pain for which Christopher D. Kager, M.D., performed lumbar fusion surgery at L4-L5 on September 2, 2014, see tr. at 401, 675 (surgical history), and for which Plaintiff had bilateral transforaminal epidural steroid injections at L5 on November 4, 2014. See id. at 395 (injection history). In April 2021, Plaintiff reported to Lucy Ann Quinn, PA-C ("PA Quinn"), at his primary care practice, that the lower back pain returned, radiating down his legs to his toes. Id. at 485. On examination, PA Quinn noted spasms and tenderness in the lumbar spine and positive straight leg-raising tests ("SLR") on the left and right.[7] Id. at 486. PA Quinn referred Plaintiff to physical therapy and to Dr. Kager, and prescribed Flexeril.[8] Id. at 486, 488.

On May 12, 2021, when Plaintiff was seen at Lancaster General NeuroScience & Spine Associates ("N&S"), he reported to Carissa Ramaika, C.R.N.P. ("NP Ramaika") that he had lower back pain with burning and radiation into the buttocks and legs, right greater than left. Tr. at 404-05. On examination, NP Ramaika noted that the range of

---

[7]Straight leg-raising test is used to determine lumbar radiculopathy. "[W]ith the patient lying supine, the symptomatic leg is lifted with the knee fully extended; pain in the lower extremity between 30 and 90 degrees of elevation indicates lumbar radiculopathy, with the distribution of the pain indicating the nerve root involved." Dorland's Illustrated Medical Dictionary, 33rd ed. (2022) ("DIMD"), at 1871.

[8]Flexeril (generic cyclobenzaprine) is a muscle relaxant. See https://www.drugs.com/flexeril.html (last visited Sept. 4, 2026).

motion ("ROM") of Plaintiff's spine was "slightly limited by pain," and that he had a positive "SLR" on the right. Id. at 405. NP Ramaika prescribed diclofenac, ordered an MRI, and recommended that Plaintiff continue with physical therapy which he had begun the prior week.[9] Id.

On June 16, 2021, when Plaintiff returned to N&S, Brandan Temple Lykens, PA-C ("PA Lykens"), noted Plaintiff's back pain radiating to the leges, and numbness and tingling in both legs, and occasional weakness in the right leg. Tr. at 400. On examination, PA Lykens noted a right-sided limp and that Plaintiff was slow to rise from a seated position. Id. at 403. Lumbar x-rays did not "reveal the etiology of his pain." Id. at 404. PA Lykens ordered an MRI. Id. at 404. A July 1, 2021 lumbar MRI showed the fusion at L4-5 "without complication," and a generalized disc bulge resulting in mild to moderate deformity of the thecal sac and degenerative disc disease, similar to a 2018 MRI. Id. at 421.

On July 6, 2021, PA Lykens recommended physiatry for injections. Tr. at 399. Dr. Kager agreed, recommending injections and therapy before considering surgery. Id. On July 26, 2021, Robert Roberts, M.D., consulted with Plaintiff about epidural steroid injections. Id. at 395. Dr. Roberts noted diminished sensation to light touch over the left thigh and calf, and a mildly positive SLR. Id. at 398. Dr. Roberts performed bilateral L3

[9]Diclofenac (brand name Voltaren) is a nonsteroidal anti-inflammatory drug used to treat mild to moderate pain, including the signs and symptoms of osteoarthritis and rheumatoid arthritis. See https://www.drugs.com/diclofenac.html (last visited Sept. 4, 2026).

transforaminal epidural steroid injections on November 18, 2021. Id. at 393; see also id. at 675 (injection history). When Plaintiff saw PA Quinn on January 12, 2022, he reported that the injection provided relief for 3-6 days. Id. at 508. Plaintiff had an annual examination with PA Quinn on November 23, 2022, at which PA Quinn noted tenderness and decreased ROM of the lumbar spine. Id. at 659.

On March 6, 2023, Plaintiff complained to neurologist Saira Saad, M.D., that he had a flare up of low back pain and acute neck pain which started after stretching exercises. Tr. at 605. The doctor recommended physical therapy and an orthopedic referral. Id. Plaintiff had an initial evaluation for physical therapy for his neck and back pain on March 15, 2023. Id. at 636. Brooke Rutter, D.P.T. ("PT Rutter") noted that Plaintiff's lower back pain started a week ago and he had limited lumbar range of motion. Id. at 638. PT Rutter recommended sessions twice a week for three weeks. Id. On April 13, 2023, at Plaintiff's second physical therapy session, he reported that his back pain was much better. Id. at 648. PT Rutter discharged Plaintiff from therapy on September 6, 2023, due to an inactive file – his last therapy visit, which was his second, occurred on April 13, 2023. Id. at 647.

On December 6, 2023, Plaintiff had an annual exam with PA Quinn, during which he continued to complain of back pain and spasms. Tr. at 693-98. PA Quinn continued Plaintiff on Flexeril and made a referral to Dr. Martinez for Plaintiff's back.[10] Id. at 696-97. On January 10, 2024, Plaintiff followed up with PA Quinn, during which he

[10]Dr. Martinez is not identified in the record.

complained of "some lower lumbar discomfort." Id. at 699. PA Quinn referred Plaintiff back to Dr. Roberts. Id.

On January 24, 2024, Plaintiff reported to Ashley Allis, C.R.N.P., ("NP Allis") that he was the victim of a hit and run motor vehicle accident in August 2023 resulting in "a thoracic spine compression fracture." Tr. at 675. CT records from August 22, 2023 show "anterior wedging of T3 and T4, mild thoracic degenerative disc disease ("DDD"), and DDD at L3-4. Id. at 677. On examination, NP Allis found limited flexion, lumbosacral spine tenderness, and a mild positive SLR bilaterally. Id. NP Allis noted that Plaintiff had been doing home exercises since the accident, using ice/heat, Tylenol, ibuprofen, and a muscle relaxer without improvement. Id. at 678. She ordered an MRI and recommended Plaintiff follow up with Dr. Roberts to discuss a treatment plan. Id.

b. Vertigo & Syncope

Plaintiff also has a history of incidents of dizziness followed by a loss of consciousness that originally occurred around 2010, but these incidents resolved on their own. See tr. at 558. The dizziness began occurring again in December 2020. Id.[11] PA Quinn saw Plaintiff on December 21, 2020, in follow-up to an emergency room visit on December 15, 2020, after Plaintiff experienced dizziness, nausea, and vomiting, and a possible loss of consciousness. Id. at 464. PA Quinn referred Plaintiff for physical

[11] Plaintiff reported to Dr. Saad that he had suffered a concussion in 2019. Tr. at 557.

therapy for vertigo and a neurosurgery consult.[12] Id. at 466. On December 28, 2020, Plaintiff reported to neurologist Robert Hernandez, M.D., that he had been experiencing episodes of vertigo for "a couple of years," but in the prior few weeks, he had 3 or 4 episodes of dizziness and vertigo resulting in loss of consciousness.[13] Tr. at 406-07. The doctor ordered a brain MRI. Id. at 410. The MRI was normal, but included a notation of a "12 mm nonaggressive cystic lesion in the supraorbital [left] frontal bone." Id. at 423.

On January 19, 2021, PA Quinn saw Plaintiff in follow up for dizziness. Tr. at 471. Plaintiff reported three episodes of dizziness the prior week. Id. at 474. An EKG was normal. Id. PA Quinn noted that Plaintiff was following up with neurology. Id. An April 12, 2021 carotid ultrasound was also normal. Id. at 435. On August 9, 2021, PA Quinn noted that Plaintiff attended only one physical therapy session for vertigo and she referred him back to physical therapy.[14] Id. at 493-95. On October 5, 2021, Plaintiff reported to PA Quinn that he had attended twelve sessions of physical therapy for the

---

[12]PA Quinn noted that Plaintiff was taking Antivert (generic meclizine), an antihistamine used to treat symptoms of vertigo and prevent nausea, vomiting, and dizziness caused my motion sickness. Tr. at 466; see also https://www.drugs.com/antivert.html (last visited Sept. 4, 2026). Based on the treatment note, it appears that Plaintiff was prescribed Antivert by the hospital.

[13]According Dr. Hernandez's notes, Plaintiff went to the emergency department after one episode and had a CT scan done, showing "a small cystic lesion in the skull in the supraorbital region." Tr. at 407. There are no corresponding emergency department records in the file.

[14]The doctor also noted that Plaintiff attempted to return to work, but had a vertigo episode on his fourth day back and had to have his boss drive him home. Tr. at 493.

vertigo, but the vertigo spells continued with about the same frequency, duration, and intensity. Id. at 500.

On July 26, 2022, Plaintiff reported to Dr. Saad that the spells begin with "feeling cold, chills, dizziness[,] severe nausea followed by [a] spinning sensation[,] vomiting followed by a loss of consciousness. Tr. at 558. Dr. Saad ordered an EEG, brain MRI, and prescribed Keppra.[15] Id. The only notable finding on MRI was a 1 cm lesion in the left frontal bone "most likely migrainous white matter change." Id. at 563-64.

On February 16, 2023, Plaintiff reported to Susan Coonahan Hite, C.R.N.P., ("NP Hite") of Cardiac Consultants, that he had six episodes the prior year. Tr. at 575. He also said he did not feel well when he took all of his medication and NP Hite advised him that he should not be driving if he was not taking Keppra and that he should talk to his neurologist about other medication options. Id. at 572.

On March 6, 2023, Plaintiff reported to neurologist Dr. Saad that he could not tolerate Keppra and had not been taking it regularly. Tr. at 603. Dr. Saad changed Keppra to Lamictal.[16] Id. at 605. On follow up with PA Quinn on June 28, 2023, Plaintiff reported that he was "still getting vertigo," and takes "meclizine when he gets a spell." Id. at 662. On January 10, 2024, Plaintiff reported to PA Quinn that he had not been taking his Lamictal and would be seeing the neurologist. Id. at 699.

---

[15]Keppra is an anticonvulsant. See https://www.drugs.com/keppra.html (last visited Sept. 4, 2026).

[16]Lamictal is an anticonvulsant used to treat epileptic seizures. See https://www.drugs.com/lamictal.html (last visited Sept. 4, 2026).

c. Inguinal Hernia

On October 5, 2021, Plaintiff complained that the hernia in the lower left quadrant of his abdomen had "gotten bigger."[17] Tr. at 500. PA Quinn referred Plaintiff for a surgical consult. Id. at 503. General surgeon David A. Vaughn, M.D., consulted with Plaintiff regarding the hernia on October 29, 2021. Id. at 548. Plaintiff told Dr. Vaughn that the hernia caused discomfort when he was lifting or straining. Id. at 548. Dr. Vaughn surgically repaired the hernia on April 11, 2022, id. at 541, and at a follow up visit on May 3, 2022, the doctor noted a well-healed incision and imposed a 25-pound lifting restriction for the following 6 weeks. Id. at 538-39.

d. Mental Impairments

Plaintiff also treated with PA Quinn for ADHD, for which she prescribed Adderall, and depression, for which she prescribed Lexapro.[18] See tr. at 458 ((10/14/20). On August 9, 2021, despite Plaintiff's complaints of decreased concentration, PA Quinn's mental status examination ("MSE") was normal. Id. at 493-94. Similarly, despite Plaintiff's complaints of decreased concentration and depressed mood on January 12, 2022, PA Quinn noted a normal MSE and that Plaintiff's depression was stable on Lexapro. Id. at 509-11; see also id. at 525-26 (4/20/22), 657-59 (11/23/22), 662-64

[17]PA Quinn noted that this was the first time Plaintiff had mentioned the hernia to her, but he explained that he had noticed it for the "past couple of years." Tr. at 500.

[18]Adderall is a central nervous system stimulant used to treat ADHD. See https://www.drugs.com/adderall.html. Lexapro (generic escitalopram) is an antidepressant. See https://www.drugs.com/lexapro.html (last visited Sept. 4, 2026).

(6/28/23). On December 6, 2023, Plaintiff told PA Quinn that Adderall was "helping with his focus and concentration," but complained that he was feeling more depressed. Id. at 693. PA Quinn replaced Lexapro with Celexa.[19] On January 10, 2024, despite Plaintiff's complaints of decreased concentration, depressed mood, and memory loss, PA Quinn noted that Plaintiff's ADD was stable on Adderall, and his depression "is controlled on Celexa." Id. at 701-02.[20]

2. Consultants and State Agency Physicians

On February 23, 2023, Ahmed Kneifati, M.D., conducted an internal medicine examination. Tr. at 581-85. Dr. Kneifati noted that Plaintiff's gait was normal with no assistive device and his squat was limited to 55%. Id. at 583. Dr. Kneifati noted tenderness at L4-5 and a negative SLR bilaterally. Id. at 584. Plaintiff had full strength in his upper and lower extremities. Id. The doctor noted reduced ROM in Plaintiff's spine, but all other joint movement was within normal limits. Id. at 593-95.

Dr. Kneifati completed a Medical Source Statement, finding that Plaintiff could occasionally lift and carry up to 20 pounds, sit for a total of 5 hours in 1-hour increments, and stand and walk for 3 hours each in 30-minute increments. Tr. at 586-87. Dr. Kneifati found Plaintiff had no limitations using either hand and could frequently use foot

---

[19]Celexa is an antidepressant used to treat MDD. See https://www.drugs.com/celexa.html (last visited Sept. 4, 2026).

[20]PA Quinn also treated Plaintiff for asthma and chronic obstructive pulmonary disease, described as stable on albuterol inhalers. See tr. at 455 (10/14/20). These impairments are not implicated in Plaintiff's claims.

controls with either foot. Id. at 588. He should never climb ladders or scaffolds, and could occasionally perform all other postural activities. Id. at 589.

On August 22, 2023, at the reconsideration level, Glenda Ann Cardillo, M.D., found from her review of Plaintiff's records that he could occasionally lift and/or carry 20 pounds, and frequently lift/carry 10 pounds, stand and/or walk for 6 hours, and sit for 6 hours in an 8-hour workday.[21] Tr. at 79. Dr. Cardillo opined that Plaintiff should never climb ladders, ropes or scaffolds; could occasionally climb ramps/stairs and stoop; could frequently balance; and had no limitation in kneeling, crouching, or crawling. Id. at 80.

Leah Bielski, Psy.D., completed a mental status evaluation on March 21, 2023. Tr. at 617-22. On examination, Dr. Bielski found Plaintiff's attention and concentration intact and mildly impaired recent and remote memory. Id. at 620. Dr. Bielski diagnosed Plaintiff with persistent depressive disorder, generalized anxiety disorder, and ADHD. Id. at 621. In a Medical Source Statement, Dr. Bielski found Plaintiff had mild limitation in his abilities to understand, remember, and carry out instructions, and moderate limitation in all interaction abilities. Id. at 624.

On August 21, 2023, Paul Thomas Taren, Ph.D., found from his review of the records that Plaintiff had a non-severe mental impairment, with no limitations in his ability to interact with others, and mild limitation in his abilities to understand,

---

[21]As previously mentioned, the record does not contain the Disability Determination Explanation at the Initial Review stage and the ALJ did not refer to it in her decision.

remember, or apply information; concentrate, persist or maintain pace; and adapt or manage oneself. Id. at 77-78.

**D. Claims**

1. Consideration of Dr. Kneifati's Opinion

Plaintiff first contends that despite finding Dr. Kneifati's opinion "generally persuasive," the ALJ erred by failing to include limitations in the RFC assessment identified by the doctor without explaining such absence. Doc. 12 at 13-16. Specifically, Plaintiff complains about the absence of standing and walking limitations. Id. Defendant responds that the ALJ properly considered Dr. Kneifati's opinion. Doc. 13 at 5-9.

As previously discussed, Dr. Kneifati found that Plaintiff was limited to sitting 5 hours in 1-hour increments and standing and walking for 3 hours each in 30-minute increments. Tr. at 587. In addition, Dr. Kneifati found that Plaintiff could frequently use his feet to operate foot controls. Id. at 588. He was limited to only occasional postural activities, other than climbing ladders and scaffold, which the doctor opined Plaintiff should never do. Id. at 589. Finally, Dr. Kneifati found that Plaintiff should never be exposed to dusts, odors, fumes, and pulmonary irritants. Id. at 590.

In her decision, the ALJ explained her consideration of Dr. Kneifati's opinion.

> On February 23, 2023, Dr. Kneifati . . . opined [Plaintiff] could lift and carry up to twenty pounds occasionally; sit five hours per workday; stand three hour per workday; walk three hour per workday; did not require any cane to ambulate; could continuously perform all use of hands; could frequently operate foot controls; could never climb and crawl; could never work at unprotected heights, with moving mechanical parts, with the operation of a motor vehicle, or with pulmonary irritants; and could work occasionally with extreme cold and extreme heat ([tr. at 581-85]). The

> undersigned finds this opinion generally persuasive, as it is generally consistent with the objective evidence of record, including [Plaintiff's] generally unremarkable physical examination findings including January 2022 objective findings of no acute distress, a normal weight, normal pulmonary effort, no respiratory distress, normal breath sounds, no wheezing, no abdominal tenderness, a normal cervical [ROM], some decreased lumbar [ROM], normal foot [ROM], normal sensation in his feet, no focal neurological deficit, intact cranial nerves, intact motor function, normal intact coordination, an intact gait, and normal and symmetric reflexes ([id. at 509-10]); and the July 2022 objective findings of no acute distress, clear respiration, normal attention and recall, intact facial sensation, normal facial strength, normal motor bulk and tone in all four extremities, intact finger/nose testing, an unremarkable gait, and intact sensation ([id. at 557-58]). This opinion was also generally supported by Dr. Kneifati's own February 2023 consultative examination findings of [no] acute distress, a normal gait, an ability to walk on his heels and toes without difficulty, a squat to 55%, no use of any assistive device, a normal stance, no difficulty getting on and off the examination table or rising from sitting, clear lungs to auscultation, no abdominal tenderness, negative straight leg raising both supine and seated, no joint deformity, some L4-5 tenderness, no sensory deficits, full 5/5 strength in all four extremities, no edema, and intact hand and finger dexterity ([id. at 581-85]). **However, the undersigned further notes that there is no objective evidence to suggest [Plaintiff] has an ability to sit only five hours per workday instead of six hours per workday, any limitations with foot controls, postural limitations with kneeling, crouching and crawling, or any need to completely avoid environmental factors.**

Tr. at 37-38 (emphasis added).

Plaintiff complains that the ALJ failed to address Dr. Kneifati's limitation to standing and walking 3 hours each in 30-minute increments. Doc. 12 at 13. Defendant argues that the ALJ accepted Dr. Kneifati's standing and walking limitations by limiting Plaintiff to light work. Doc. 13 at 6-7. In reply, Plaintiff contends that "Defendant's '3+3=6' rationale is . . . an impermissible post-hoc justification that cannot substitute for the analysis the ALJ was required to provide." Doc. 14 at 3.

Plaintiff relies on cases in which the ALJ failed to include limitations contained in the opinion evidence. See Emerick v. Astrue, Civ. No. 12-349, 2013 WL 1700974, at *4 (W.D. Pa. Apr. 18, 2013) (finding error where the ALJ gave significant weight to an opinion which contained specific mental limitations that were not included in the RFC assessment without explanation); Khanna v. Astrue, Civ. No. 12-2058, 2014 WL 6893671, at *15 (M.D. Pa. Dec. 5, 2014) (same). Here, the ALJ did not fail to include Dr. Kneifati's limitation to standing and walking for 3 hours each in a workday.[22] Rather, the limitation to light work encompassed such standing and walking limitations. The governing regulation defines light work as "requir[ing] a good deal of walking or standing." 20 C.F.R. § 404.1567(b). Social Security Ruling 83-10, which addresses "the issue of capability to do other work," provides further guidance regarding the requirements of light work. "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, "Titles II and XVI: Determining Capability to Do Other Work – The Medical Vocational Rules of Appendix 2," 1983, WL 31251, at *6 (Jan. 1, 1983); see also Jeffrey W. v. Bisignano, Civ. No. 24-6035, 2026 WL 524424, at *7 (E.D. Pa. Feb. 25, 2026) (ability to sit for 6 hours and stand and walk for 3 hours each is consistent with light work); Turner v. Bisignano, Civ. No. 25-570, 2026 WL 497533, at *11 (M.D. Pa. Feb. 23, 2026) (citing cases and concluding that "an ALJ's failure to explicitly set forth a function-by-function

[22]When the ALJ questioned the VE, she stated that the individual would be able to "stand[] and walk[] for about 6 hours in an 8-hour workday with normal breaks." Tr. at 68.

assessment of a claimant's ability to stand and walk in the RFC is not reversible error where the ALJ limited the claimant to light work and the RFC assessment is otherwise supported by substantial evidence"). Thus, I find no error in the ALJ's determination that Plaintiff is capable of performing light work. Similarly, I reject Plaintiff's argument that the hypothetical posed to the VE was flawed on the same basis.

2. Consideration of Vertigo and Syncope

Plaintiff next complains that the ALJ did not properly consider his syncope and vertigo. Doc. 12 at 18-20. Specifically, Plaintiff argues that "[a]lthough the ALJ acknowledged that the Plaintiff claimed disability due to multiple impairments, including vertigo and dizziness, she did not provide an explanation for her determination that these impairments were not severe, nor did she address their potential impact on Plaintiff's RFC." Id. at 18. Defendant responds that the limitations in the ALJ's RFC adequately addressed Plaintiff's vertigo and syncope. Doc. 13 at 8-11.[23]

Contrary to Plaintiff's premise, the ALJ found that Plaintiff's epilepsy was severe.[24] Tr. at 28. In addition, the ALJ included several limitations addressing

---

[23]Plaintiff did not address this claim further in his reply. See Doc. 14.

[24]Although the treatment providers and consultative examiner referred to Plaintiff's vertigo and syncope using different labels, see tr. at 496 (8/1/16 – PA Quinn – vertigo), 339 (NP Hite – vertigo with dizziness and syncope is a neurologic issue), 499 (7/26/22 – Dr. Saad – seizure-like activity), 584 (2/23/23 – Dr. Kneifati – seizure disorder and vertigo), Dr. Cardillo considered Plaintiff's neurological disorder as epilepsy and considered Listing 11.02, applicable to epilepsy. Id. at 78-79.

Epilepsy is "any group of syndromes characterized by paroxysmal transient disturbances of the brain function that me be manifested as episodic impairment or loss of consciousness, abnormal motor phenomena, psychic or sensory disturbances, or perturbation of the autonomic nervous system." DIMD, at 626.

Plaintiff's dizziness and syncope, finding Plaintiff can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; and can frequently balance on even terrain. Id. at 32. In addition, the ALJ found that Plaintiff must avoid hazards such as unprotected heights. Id. These limitations account for Plaintiff's syncope and vertigo, and, notably, Plaintiff has failed to identify any additional limitations missing from the ALJ's RFC assessment. See Hamm v. Colvin, Civ. No. 15-778, 2016 WL 6246837, at *3 (M.D. Pa. Sept. 30, 2016) (remand not appropriate unless the plaintiff "identif[ies] specific functional limitations that were omitted from the ALJ RFC") (citing Rutherford v. Barnhart, 399 F.3d 546, 552-53 (3d Cir. 2005)); see also Vargas v. Saul, Civ. No. 19-1492, 2020 WL 4226552, at *15 (M.D. Pa. July 23, 2020) (same).

3. Moderate Interaction Limitations

Finally, Plaintiff contends that the ALJ erred by failing to include any limitations addressing Plaintiff's moderate limitation in interacting with others or explaining why no limitations were included. Doc. 12 at 20-25. Defendant responds that the ALJ's RFC assessment belies Plaintiff's argument. Doc. 13 at 12-14. In reply, Plaintiff argues that a limitation to "no tandem work" does not address the moderate limitation in social interaction. Doc. 14 at 4-5.

At the third step of the sequential evaluation, in considering the relevant mental health Listings, the ALJ found that Plaintiff had moderate limitation in interacting with others. Tr. at 30. Plaintiff contends that the ALJ's limitation to "no tandem work where fellow employee[s] would rely upon the completion of a specific task by [Plaintiff] to complete the production process" is insufficient to address the moderate interaction

limitation. Doc. 14 at 4-5. I have not found, and neither party has cited, any caselaw on this specific point. However, I do not write on a blank slate. In Hess v. Commissioner of Social Security, the Third Circuit addressed the inter-relationship of the finding at step 3, involving the B criteria of the mental health Listings, and the RFC assessment. 931 F.3d 198, 213 (3d Cir. 2019).

Hess involved an ALJ finding of moderate limitation in the plaintiff's abilities to concentrate, persist, or maintain pace at step 3, which the plaintiff argued was not adequately addressed in an RFC limitation to "simple tasks." 931 F.3d at 200-01. The Third Circuit concluded that the findings at step 3 must be "adequately conveyed" in the RFC assessment. Id. at 210 (citing Ramirez v. Barnhart, 372 F.3d 546, 552 n.2 & 554 (3d Cir. 2004)). "In short, the functional limitation findings [of step 3] do not dictate the terms of the ALJ's statement of the claimant's limitations in the final analytical steps. But those findings are relevant to that statement of the limitation, which must be sufficient to reflect all of a claimant's impairments." Id. In order to determine the sufficiency of the ALJ's RFC assessment, "it is essential to assess whether a valid explanation has been given for [the RFC assessment]." Id. at 213. In Hess, based on the ALJ's discussion, the Third Circuit found that the ALJ provided "a valid explanation for [a] 'simple tasks' limitation . . . [because] the ALJ explained at length and with sound reasoning shy Hess's 'moderate' difficulties in 'concentration, persistence, or pace' were not so significant that Hess was incapable of performing 'simple tasks.'" Id. at 213.

In the case at hand, the ALJ found at step 3 that Plaintiff had a moderate limitation in his ability to interact with others. Tr. at 30. In doing so, the ALJ explained Plaintiff's functional deficiencies.

> In interacting with others, [Plaintiff] has a moderate limitation. For example, [Plaintiff] testified he has met a new girlfriend since he stopped working. In addition, in October 2022, [Plaintiff] noted he could spend time with others and get along with authority figures ([tr. at 241-51]). In February 2023, [Plaintiff] did childcare three times per week, showered and dressed daily, and socialized with friends ([id. at 581-99]). Further in March 2023, [Plaintiff] stated he could groom himself independently on a daily basis, grocery shop three times per week, take public transportation, socialize with his girlfriend and children, and spend time with his children ([id. at 617-31]). In addition, on March 21, 2023, Leah Bielski, Psy.D., a consultative examiner, found [Plaintiff] had appropriate dress, satisfactory grooming and hygiene, normal motor behavior, appropriate eye contact, fluent speech, coherent and goal-directed thought processes without hallucinations or delusions, appropriate affect, and a euthymic mood ([id.]).

Tr. at 30-31. During her discussion of the RFC assessment, the ALJ also cited various records establishing Plaintiff's abilities to interact and socialize. For example, the ALJ cited Plaintiff's testimony that he had a new girlfriend, id. at 33 & 36 (citing id. at 55), Plaintiff's Function Report in which he stated that he spends time with others, follows spoken instructions, gets along with authority figures, and handles changes in a routine, id. (citing id. at 241-48), Dr. Kniefati's report noting that Plaintiff shopped monthly, did childcare three times a week, and socialized with friends, id. (citing id. at 581-85), and the mental status evaluation by Dr. Bielski in which the doctor reported Plaintiff grocery

shops three times per week, takes public transportation, socializes with his girlfriend, and spends time with his children. Id. (citing id. at 617-22).

Moreover, in considering the opinion evidence, the ALJ found Dr. Taren's opinion more persuasive than Dr. Bielski's. Dr. Taren found that Plaintiff had no interaction limitations. Tr. at 77. Dr. Bielsky found Plaintiff had moderate limitations in all interaction categories. Id. at 624. Specifically, the ALJ explained that she found Dr. Bielski's opinion "only partially persuasive, as it is only partially consistent with [Plaintiff's] lack of subjective complaints of social limitations, and his completely unremarkable [MSEs]," and "only somewhat supported by D. Bielski's own March 2023 consultative examination findings" including appropriate dress, satisfactory grooming and hygiene, normal motor behavior, appropriate eye contact, fluent speech, and coherent and goal-directed thought processes without hallucinations or delusions. Id. at 38 (citing id. at 617-22). The ALJ found Dr. Taren's assessment "more persuasive, as it is consistent with [Plaintiff's] completely unremarkable [MSEs]," and Dr. Bielski's findings noted above. Id. at 39 (citing id. at 510, 526, 660, 696, 701).

Thus, like the ALJ in Hess, the ALJ here adequately explained her reasons for failing to include any interaction limitations beyond tandem work. Because neither Plaintiff's testimony nor the treatment records support additional interaction limitations, the ALJ's decision is supported by substantial evidence in this regard..

## IV. CONCLUSION

The ALJ's decision is supported by substantial evidence. The ALJ properly considered Dr. Kneifati's opinion and the limitation to light work encompassed Dr.

Kneifati's standing and walking limitations. The ALJ properly considered Plaintiff's vertigo and syncope and included limitations in the RFC assessment to address such impairment. The ALJ's RFC assessment adequately addressed the moderate interaction limitations found at step three where the ALJ adequately explained her RFC determination in this regard, consistent with Hess, 931 F.3d at 213.

An appropriate Order follows.